UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

        Plaintiff,

v.

D-3 Jamal Caffey-Bostic,

        Defendant.

Case No. 18-20512

Honorable Mark A. Goldsmith

## Government's Response in Opposition to Defendant's Motion for Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (R. 113)

Defendant Caffey-Bostic drove multiple kilograms of heroin, cocaine and crack cocaine from Texas to Detroit. His conduct would have required him to serve at least 10 years in prison, but for his safety valve eligibility. The Court sentenced him to 36 months in prison. (R. 103: Judgment). Caffey-Bostic reported to the Bureau of Prisons (BOP) on February 26, 2020. He has only served three months. He has now asked the Court to resentence him to home confinement. The Court cannot resentence him as requested. The BOP has exclusive authority to determine who is released to home confinement. Nor does Caffey-Bostic qualify for compassionate release. As a threshold matter, compassionate release requires a defendant exhaust his administrative remedies, something Caffey-Bostic has not even attempted. This requirement cannot be waived by the Court as he suggests.

*United States v. Alam*, No. 20-1298 ___F.3d___, 2020 WL 2845694 (6th Cir. June 2, 2020). His failure to do so forecloses him from relief.

Nor does Caffey-Bostic satisfy the statutorily mandated criteria for compassionate release because he has not presented "extraordinary and compelling" reasons to warrant a sentence reduction. See 18 U.S.C. § 3582(c)(1)(A). To be eligible for relief based on a medical condition, Caffey-Bostic must show either that he suffers from a terminal illness or that his medical condition "substantially diminishes [his] ability…to provide self-care within the environment of a correctional facility and from which he…is not expected to recover." U.S.S.G. § 1B1.13(1)(A) & cmt. 1. Even coupled with the COVID-19 pandemic, Caffey-Bostic's asthma does not fall into this category. "[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Caffey-Bostic's failure to meet the criteria in USSG § 1B1.13 also forecloses relief. Finally, the nature of his offense itself make him a danger to the community. See U.S.S.G. § 1B1.13(2). His motion should be denied.

## Background

DEA agents identified Charles Toney as a substantial drug supplier from Arkansas with an established customer based in Detroit, Michigan. Toney and other members of the conspiracy used an address in Eastpointe, Michigan to receive and store kilograms of drugs. On December 5, 2016, Caffey-Bostic delivered drugs to Toney at the Eastpointe residence. Caffey-Bostic, like Toney, was from Arkansas. Separately, but in coordination, they traveled from Arkansas to Texas where they met to obtain the drugs. Caffey-Bostic repeatedly communicated with Toney leading up to and just moments before they met at the Eastpointe residence. (Presentence Investigation Report (PSR) ¶ 19). Police stopped Caffey-Bostic shortly after he left. He did not have any drugs in the car – they had already been unloaded at the house – but an officer seized approximately $2,500. Caffey-Bostic refused to give the officer his phone number. (*Id.* ¶ 15). One of Caffey-Bostic's first calls after he was stopped was to Toney. When DEA agents searched the Eastpointe residence later that same day they seized the drugs Caffey-Bostic delivered, which included more than three kilograms of heroin, almost a kilogram of cocaine and half a kilogram of crack cocaine. (R. 86: Plea Agreement, 247-48, 256).

On September 20, 2019, Caffey-Bostic pleaded guilty to conspiracy to possess with intent to distribute controlled substances. (*Id.*) On January 15, 2020,

3

this Court sentenced him to 36 months in prison (R. 103: Judgment). On February 26, 2020, Caffey-Bostic reported to the BOP. He has served approximately three of his 36 months sentence. Caffey-Bostic has not petitioned the BOP for compassionate release. Instead, on May 29, 2020, he filed the instant motion.

## Argument

### I. The Court cannot resentence Caffey-Bostic to home confinement.

A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). The statutory exceptions to this rule are narrow and are only permissible when there is a retroactive change to the guideline range or it is expressly permitted by statute. 18 U.S.C. § 3582(c)(1) and (c)(2). Caffey-Bostic's request for resentencing to home confinement does not fall within any of the statutory exceptions. The BOP, not the sentencing court, has the exclusive authority to determine a person's place of incarceration – including home confinement. Such a decision "is not reviewable by any court." 18 U.S.C. § 3621(b). The CARES Act did not alter this authority. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). Courts in this district have also recognized that under the CARES Act the authority to transfer an inmate to home confinement remains squarely allocated to the BOP. See *United States v. Oliver*, 17-CR-20489, 2020 WL 2768852 (E.D. Mich. May 28, 2020) (Berg, J)

(citing cases). Therefore, the Court cannot grant Caffey-Bostic's requested relief to modify his sentence and direct the BOP to release him to home confinement. (R. 113: Defendant's Motion: 652, 656- 58). This is especially true now, given the BOP's substantial and ongoing efforts to address the COVID-19 pandemic.

### A. The BOP's precautions have mitigated the risk from COVID-19 within its facilities.

The BOP has reacted quickly to confront COVID-19's spread within its facilities. For over almost a decade, the BOP has maintained a [detailed protocol](#) for responding to a pandemic. Consistent with that protocol, the BOP began modifying its operations to implement its COVID-19 Action Plan and minimize the risk of transmission into and inside its facilities. *See* [BOP COVID-19 Modified Operations Website](#). Since then, as the worldwide crisis has evolved, the BOP has repeatedly revised its plan. To stop the spread of the disease, the BOP has restricted inmate movement within and between facilities. *See* [Id.](#) Only limited group gathering is allowed, social and legal visits have been suspended, but inmates have been permitted an additional 500 minutes per month for calls. Staff and inmates are also issued face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation](#). Newly admitted inmates and staff are screened. High risk asymptomatic and symptomatic inmates are quarantined. Staff are screened for symptoms and placed on leave if necessary.

Like all other institutions, penal and otherwise, the BOP has not been able to eliminate the risks from COVID-19 completely, despite its best efforts. But the BOP's measures will help federal inmates remain protected from COVID-19 and ensure that they receive any required medical care during these difficult times.

**B.     The BOP is increasing the number of inmates who are granted home confinement.**

The BOP has also responded to COVID-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the BOP to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the COVID-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the BOP to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the BOP to identify the inmates most at risk from COVID-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The BOP's efforts on this point are not hypothetical. Over 3,793 federal inmates have been granted home confinement since the COVID-19 pandemic

6

began, and that number continues to grow. BOP Coronavirus FAQs. As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

> 1.) Each inmate's age and vulnerability to COVID-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting COVID-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the COVID-19 pandemic far better than any other solution does. The BOP cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for COVID-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring COVID-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The BOP' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

7

The BOP's home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the BOP must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting COVID-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the COVID-19 pandemic.

**II.     Caffey-Bostic does not qualify for compassionate release.**

Just like a court's authority to modify a defendant's previously imposed sentence is narrowly circumscribed, compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. Because this requirement is a statutory one and not judicially crafted, it is mandatory. By failing to exhaust his administrative remedies and filing the instant motion, Caffey-Bostic is imploring the Court to ignore the statute's mandatory exhaustion requirement. But doing so is not permitted by Sixth Circuit case law. Caffey-Bostic's motion should therefore be dismissed on this ground alone.

*Second*, even if a defendant exhausts his remedies, he must show "extraordinary and compelling reasons" for compassionate release, meaning a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2). Caffey-Bostic's asthma, even in light of the COVID-19 pandemic, does not qualify as an extraordinary or compelling medical condition justifying release.

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) –

9

defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public – support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13.

Caffey-Bostic is foreclosed from relief on each basis.

### A. The Court is barred from granting release because Caffey-Bostic has not exhausted his administrative remedies.

The Court must dismiss without prejudice Caffey-Bostic's motion because he has not satisfied the exhaustion requirement for compassionate release under § 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

The provision permitting a defendant-initiated motion includes an exhaustion requirement. A district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the BOP or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A). The Third Circuit found the failure to comply with the administrative exhaustion requirement a "glaring roadblock foreclosing compassionate release." *United States v. Raia*, 954 F.3d 594, 597. (3d Cir. 2020). The Sixth Circuit concurred and ruled that failure to exhaust administrative

10

remedies cannot be excused even in light of the COVID-19 pandemic. *United States v. Alam*, No. 20-1298 \_\_\_F.3d\_\_\_, 2020 WL 2845694 (6th Cir. June 2, 2020).

In *Alam*, the Court acknowledged time is always of the essence for prisoners applying for compassionate release and diseases with the morbidity of COVID-19 arise only occasionally, but to craft exceptions to the [exhaustion] rule, "would make nearly every prisoner eligible…to jump the line of applications – making the process [for application for compassionate release] less fair." *Id*. at *4.

Caffey-Bostic acknowledges he never even attempted to exhaust his administrative remedies. (R.113: Defendant's Motion, 656). Instead by filing the instant motion he has disregarded the statutory requirement altogether. If a defendant like Caffey-Bostic fails to satisfy § 3582(c)(1)(A)'s mandatory exhaustion requirement his motion must be dismissed. *Id*. at *5.

### B. Caffey-Bostic's asthma is not extraordinary or compelling even in light of COVID-19 to grant him compassionate release.

Even if Caffey-Bostic had exhausted his administrative remedies, compassionate release would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well

11

developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 limits compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits

12

"extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

In support of his request for compassionate release, Caffey-Bostic cites his chronic asthma as a qualifying medical condition that makes him more vulnerable to COVID-19. (R. 113: Defendant's Motion, 651, 653, 662). But Caffey-Bostic fails to detail the severity of his asthma and his exhibit in support of his request is a one page printout from treatment he sought in December 2015 for chest pain. It does not contain any diagnosis and only references asthma in the patient history section. (R. 114: Defendant's Exhibit). When Caffey-Bostic was interviewed by the Probation Department he reported having asthma and using an inhaler, but did not mention how frequently he used his inhaler. (PSR ¶ 52). Records from BOP acknowledge a history of asthma during his general medical exam on March 4, 2020. (Gov. Sealed Exhibit 1: pg. 52). Since reporting to the BOP approximately three months ago Caffey-Bostic has been seen several times by medical staff, including since the onset of the COVID-19 pandemic. During a medical exam on

13

April 23, 2020, when his allergy medications were updated, Caffey-Bostic reported a history of asthma "as a child," and denied wheezing and shortness of breath (dyspnea). (*Id*. pg. 4). The records to date do not notate that his asthma is moderate or severe nor reference the need for an inhaler since he reported to BOP.

And it is worth noting, Caffey-Bostic's asthma was controlled enough that he played football for two years until he left college. Not only was he a collegiate athlete, but he reported enjoying working out, and there is no indication that his asthma hindered his participation. (PSR ¶¶ 60-61). There is no reason to believe that his asthma is anything other than a mild condition. The CDC recognizes individuals with *moderate to severe* asthma may be more at risk of COVID-19. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html. But new research suggests that someone with mild to moderate asthma is no worse off because of COVID-19 than someone who does not have asthma. https://www.nytimes.com/2020/04/16/health/coronavirus-asthma-risk.html.

While he does not cite it as a basis for relief, the government noted Caffey-Bostic has been treated for chest pain or pressure in the past and within BOP, including as recently as May 4, 2020. But during the visit he denied other issues including fever, shortness of breath, cough, or aches and his cardiovascular and respiratory health was regular. Ultimately, he was treated for hay fever (allergic rhinitis). (Gov. Sealed Exhibit 1: BOP Medical Records, pg. 2). Nothing supports

14

the notion that Caffey-Bostic's medical condition is a terminal illness, nor does he have a medical condition that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he is not expected to recover." U.S.S.C. § 1B1.13, application note 1. Instead, the medical records reflect that overall Caffey-Bostic is a healthy 31 year old male.

Caffey-Bostic's focus on the general nature of the COVID-19 pandemic should not alter the analysis. The government is mindful of the extreme gravity of the pandemic. But COVID-19 by itself does not qualify as the type of inmate-specific reason permitting compassionate release. As the Third Circuit explained, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. Consideration of Caffey-Bostic's age and medical condition do not satisfy the requirements for release in USSG § 1B1.13 cmt. n.1, even in light of the COVID-19 pandemic. This Court and others have similarly found that asthma alone does not qualify a defendant for compassionate release. See *United States v. Whitford,* No. 13-20510 (E.D. Mich. May 21, 2020); *United States v. Brown*, No. 19-20202, 2020 WL 2572274, at *2 (E.D. Mich. May 21, 2020).

15

The BOP has worked diligently to implement precautionary measures reducing the risk of COVID-19 to Caffey-Bostic and other inmates. To date, FCI Beaumont, where Caffey-Bostic is incarcerated, has not reported a single case of COVID-19 among inmates and only one among staff. And a review of the medical records belies some of Caffey-Bostic's claims that he cannot follow any of the recommendations to protect himself from the spread of COVID-19 or have his temperature taken. (R. 113: Defendant's Motion, 654-55). To the contrary, temperature checks are mandatory. (Gov. Sealed Exhibit 2: BOP May 5, 2020 Memo). Not only do the medical records reference the limitation of inmate movement, Caffey-Bostic was counseled about general protective health measures due to COVID-19. And his temperature has been taken, including on his most recent medical visit on May 4, 2020. Also on April 22, 2020, when Caffey-Bostic reported feeling feverish, he refused to go to medical to be seen, but insisted staff "just check my temperature." They did and it was within a normal range – 97.8. (Gov. Sealed Exhibit 1: pg. 11).

Caffey-Bostic is also ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th

16

Cir. 2010). The Sixth Circuit has made clear even run of the mill drug dealers without any indication they are engaged in violence are dangerous – "drug trafficking is a serious offense that, in itself poses a danger to the community. *Id.* at 955. And in this case Caffey-Bostic schemed with Charles Toney to travel from Arkansas to Texas to deliver multiple kilograms of heroin, cocaine and crack cocaine to Michigan, all highly addictive drugs that poison the community. Section 1B1.13(2) also bars the release of many other defendants. An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). So even many "non-violent" offenders—such as those who have been involved in serial or significant fraud schemes—may not be released under § 3582(c)(1)(A). USSG § 1B1.13(2).

### C. The factors in 18 U.S.C. § 3553(a) weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate

17

release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Caffey-Bostic eligible for compassionate release, the § 3553(a) factors should still disqualify him.

    Caffey-Bostic's offense was serious – so serious that Congress imposed a mandatory sentence of 10 years. But because Caffey-Bostic qualified for the safety vale the mandatory minimum did not apply. The parties and the probation department calculated his guideline range as 46-57 months. (R. 86: Plea Agreement, 248; PSR ¶ 70). The Court already varied downward ten months when it imposed a sentence of 36 months. (R. 103: Judgment). Caffey-Bostic just reported to BOP on February 26, 2020. He has only served approximately three months of a three year sentence. Granting Caffey-Bostic compassionate release at this point would lead to an unwarranted sentencing disparity, improperly minimize the seriousness of his drug trafficking offense, and undermine the deterrent effect of such a prison sentence.

    Therefore, the § 3553(a) factors independently bar his request for relief.

### III. If the Court were to grant Caffey-Bostic's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Caffey-Bostic's motion despite the government's arguments above, Court should order that he be subjected to a 14-day quarantine before release.

### Conclusion

Caffey-Bostic's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/ Andrea Hutting
Andrea Hutting
Craig F. Wininger
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI 48226
313-226-9110 phone
andrea.hutting@usdoj.gov
P68606

Dated: June 5, 2020

CERTIFICATE OF SERVICE

I hereby certify that June 5, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Sanford Schulman
Stephanie Lambert Junttila

                                      s/Andrea Hutting
                                      Andrea Hutting
                                      Assistant United States Attorney
                                      211 W. Fort Street, Suite 2001
                                      Detroit, MI 48226
                                      313-226-9110 phone
                                      andrea.hutting@usdoj.gov